## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| In re: | Case No. A15-00236-GS |
| COOK INLET ENERGY LLC, | Chapter 11 |
| Debtor. | |
| ALL AMERICAN OILFIELD, LLC, | Adv. No. A16-90002-GS |
| Plaintiff, | |
| v. | |
| COOK INLET ENERGY LLC, | |
| Defendant. | |

### MEMORANDUM ON CROSS MOTIONS FOR SUMMARY JUDGMENT

Plaintiff All American Oilfield, LLC ("All American") filed this action to establish the priority of liens it asserts against defendant Cook Inlet Energy, LLC's ("Cook Inlet") natural gas wells located on North Fork Unit 24-26, North Fork Unit 42-35, and North Fork Unit 34-26 (collectively, the "North Fork wells"), and the natural gas remaining in those wells. The liens arise under Alaska statutes for unpaid services provided by All American to drill and complete the wells. All American contends its liens prime all other interests in the wells under Alaska's "dump lien" statute, AS 34.35.140. Alternatively, All American seeks to impose a constructive trust against payment of tax credits attributable to work it has provided. Cook Inlet, the debtor in the underlying bankruptcy case, contends that the only lien All American holds is junior to the secured interests of its lender, Apollo Investment Corporation, and that All American cannot establish a constructive trust.

The parties have filed cross motions for summary judgment.  For the reasons stated below, the court shall grant Cook Inlet's motion for summary judgment in part, and deny All American's cross motion for summary judgment as to Count 1 of the complaint herein, which asserts a priority dump lien claim under AS 34.35.140(c).  The court defers its ruling on summary judgment as to Count 2 of All American's complaint, which seeks imposition of a constructive trust, to permit completion of pending discovery, pursuant to Fed. R. Civ. P. 56(d).

## I.   CASE BACKGROUND.

Cook Inlet operates oil and gas wells in southcentral Alaska, including the North Fork wells subject to this litigation.  It is a wholly owned subsidiary of Miller Energy Resources, Inc. ("Miller Energy"), a publically traded Delaware corporation.  On February 3, 2014, Miller Energy refinanced its existing credit facility with Apollo Investment Corporation ("Apollo"), resulting in a new $175,000,000 term credit facility.  As a material part of this transaction, Cook Inlet, and other related subsidiary debtors, guaranteed this new obligation.  Cook Inlet also granted Apollo security interests in substantially all of its assets, including the North Fork wells, to secure Miller Energy's refinanced debt.  To perfect its secured interests, Apollo recorded an Amended and Restated Deed of Trust, Mortgage, Security Agreement, Fixture Filing, Finance Statement and Assignment of Production and Revenues from Cook Inlet in the Homer Recording District on February 6, 2014.  All American does not challenge the validity of Apollo's secured interests in Cook Inlet's assets, including the North Fork wells, but contends that its lien primes any interest held by the lender.

On November 19, 2014, Cook Inlet entered into a contract with All American Oilfield Associates, LLC, the predecessor of All American, "to drill, complete, engineer and/or explore three wells on lands on which Cook Inlet operates oil and gas leases known as the North Fork

field."[1]  The contract was assigned to All American on December 30, 2014.[2]  Work began under the contract shortly after its execution, and All American provided labor to "drill, open up, develop, complete, engineer and/or operate" the North Fork wells.[3]  This included labor for drilling rig operations, digging holes for the wells, casing, and completing the gas wells.[4]

All American maintains that Cook Inlet owes it $322,284.51 in outstanding invoices.  To secure payment of this balance, All American recorded its Claim of Oil or Gas Lien ("Lien Claim") in the Homer Recording District on June 11, 2015.[5]  The Lien Claim states that All American's liens attached to three types of assets: 1) Cook Inlet's gas wells pursuant to AS 34.35.125, 2) to mills or machines under AS 34.35.130, and 3) to the dump or mass of minerals produced from the North Fork wells under AS 34.35.140.

On August 6, 2015, creditors of Cook Inlet filed an involuntary petition for relief under chapter 11 of the Bankruptcy Code.  Cook Inlet consented to the bankruptcy on October 1, 2015.  Contemporaneously, Miller Energy and other affiliated entities voluntarily filed petitions under chapter 11.  The court entered an order for relief in Cook Inlet's bankruptcy on October 2, 2015.  The related cases have been jointly administered, culminating in a confirmed joint plan of reorganization.

On January 14, 2016, All American initiated the instant adversary proceeding to determine the validity and priority of its secured claims.  It asserts two causes of action against

---

[1] Decl. of Peter Dickinson in Supp. of All American's Mot. for Summ. J. (Tax Credits), ECF No. 19, ¶ 7.

[2] *Id.*, ¶ 8.

[3] *Id.*, ¶10; *see also* Compl., ECF No. 1, ¶ 9.  The Claim of Lien recites that work began on January 22, 2015 and ended on May 1, 2015.  *See* Ex. A to Compl. (Claim of Oil or Gas Lien), ECF No. 1-1 at 3.

[4] Decl. of Conrad Perry in Supp. of Cook Inlet's Mot. for Summ. J., ECF No. 16, ¶¶ 6-7.

[5] Ex. A to Compl., ECF No. 1-1.

3

Cook Inlet.  The first cause of action seeks a determination that its liens against Cook Inlet's gas

wells, dumps and masses produced, the sale proceeds, and all other interests in real and personal

property are prior and preferred to all other interests regardless of when such interests arose.[6]

All American generically asserts its lien rights under AS 34.35.125 *et seq.*, but cites AS

34.35.140(c) as the basis for claiming priority over other interests.  The second cause of action

requests imposition of a constructive trust over tax credit payments Cook Inlet received from the

State of Alaska under AS 43.44.23 *et seq.*  All American alleges that Cook Inlet has received

payment on 40% of the work it has invoiced through the tax credit payments.[7]

In April 2016, All American filed two Motions for Summary Judgment, one as to its lien

priority claim, and the other as to its constructive trust claim.[8]  Cook Inlet similarly filed a

motion for summary judgment seeking dismissal of both claims, contending that All American

cannot prove essential elements of either cause of action.[9]  As part of its response to Cook Inlet's

motion for summary judgment, All American included the expert report of William Van Dyke,

P.E., a petrochemical engineer who is employed by a consulting firm specializing in Alaskan oil

and gas.[10]  Mr. Van Dyke's expert report provides an overview of the natural gas industry and

the storage of natural gas with emphasis on the industry's use of reservoirs.[11]  All American also

---

[6] Compl., ECF No. 1, ¶ 27.

[7] *Id*. at ¶ 30.

[8] ECF Nos. 10, 17.

[9] ECF No. 13.

[10] ECF No. 21-3.

[11] Mr. Van Dyke's report states that the gas reservoir in the North Fork wells is a "native gas reservoir, i.e., it holds the gas that has accumulated in it and has not been produced to date." It further states that Mr. Van Dyke is not aware that Cook Inlet has put any gas from the North Fork wells into storage in a separate gas storage reservoir. *Id.* at 2.

moved to defer any decision on its constructive trust claim, under Fed. R. Civ. P. 56(d) and Fed. R. Bankr. P. 7056, until Cook Inlet responded to its pending discovery requests.[12]  Cook Inlet, in turn, filed a motion to strike the expert testimony of Mr. Van Dyke as impermissibly opining upon questions of law.[13]

The court heard oral argument on the cross motions for summary judgment and the related motion to strike on June 8, 2016.  Determination of the motions was stayed by agreement of the parties pending a mediation of the claims.  Post-mediation, the parties submitted a stipulated order that requested a further delay in the ruling so that they could continue their settlement negotiations.  A status conference was scheduled for August 25, 2016.

The parties were unable to reach settlement.  Prior to the August 25 status conference, All American filed a Motion for Certification of Questions of Law to the Alaska Supreme Court ("Motion for Certification").[14]  In that motion, All American asked that the legal questions raised in the cross motions for summary judgment as to the interpretation and scope of the dump lien statute, AS 34.40.040, be certified to the Alaska Supreme Court for determination.  The court

---

[12] ECF No. 21.

[13] ECF No. 24.  Cook Inlet contends Mr. Van Dyke's expert report impermissibly states legal conclusions.  Much of the expert report is merely background as to current practices and standards within the natural gas industry, and as applied within Alaska.  However, Mr. Van Dyke concludes his report by construing AS 34.35.140 and AS 34.35.170, and offering a conclusion upon the ultimate question.  In this regard, the court agrees with Cook Inlet that he overreaches.  Such opinion impermissibly impinges upon the court's function.  *See Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008)(expert witness cannot testify regarding an ultimate issue of law, because this is the exclusive province of the court); *Montagne v. Safeco Ins. Co. of Illinois*, 2008 WL 2225770, at *5 (D. Alaska May 27, 2008) (an expert may not offer an opinion on an issue of law, "because it is for the court to determine the applicable law.").  Nor is Mr. Van Dyke's opinion on this point particularly helpful.  His conclusion suffers from the same analytical flaw as All American's legal analysis, as discussed below.  The court shall enter a separate order granting Cook Inlet's Motion to Strike to exclude Mr. Van Dyke's legal conclusions.

[14] ECF No. 37.

heard oral argument on the Motion for Certification on October 24, 2016, and, in a separate

order, has determined that certification of those lien issues is unnecessary.

## II.      ANALYSIS

### A.      All American's Dump Lien Claim.

The motions for summary judgment have refined All American's lien claims, and the

parties' arguments.[15]  It is undisputed that All American holds a valid mining lien against the

North Fork wells, and the natural gas located therein, under AS 34.35.125.[16] Such a lien is

subordinate to Apollo's previously perfected secured interests under the priority scheme

established for liens against such assets set forth in AS 34.35.135.[17]  All American's claim of a

---

[15] Although All American's Lien Claim references a lien against mills or machines, in addition to the wells and the "dump," All American has not alleged any facts in support of such claim in its Complaint, nor does it argue that it holds such a lien in its briefing on summary judgment.  Such a lien would, nonetheless, also be junior to Apollo's prior secured interests.  *See* AS 34.35.130, 34.35.135.

[16] AS 34.35.125 provides:

A person who, at the instance of the owner, performs work in, on, or about a mine, or mining claim, oil, gas, or other well, in opening up, developing, sinking, drilling, drifting, stoping, mucking, stripping, shoveling, mining, hoisting, firing, cooking, teaming, or performs any other class or kind of work necessary or convenient to the development, operation, working, or mining of the claim or well; or who performs work tending to or assisting in the development, extraction, separation, or reduction to a commercial value of the minerals; or who performs work on a water right, ditch, flume, pipe line, tramway, tram, road, or trail, used in connection with the opening up, or to facilitate the opening up, operation, or development of the claim or well, or the extraction of the minerals, has a lien on the mine or mining claim, oil, gas, or other claim or well as security for the payment of the work.

[17] AS 34.35.135 provides:

A lien under AS 34.35.125 and 34.35.130 is a preferred lien, prior and superior to a mortgage, conditional sale agreement, attachment, claim, or demand, unless the mortgage, conditional sale agreement, attachment, claim, or demand is in writing and recorded in the recorder's office of the recording district where the property is located before the work for which the lien is claimed is started. A sale, transfer, mortgage, assignment, or attachment made or filed for record after the work is started does not have the effect of postponing the lien.

priming dump lien under AS 34.35.140(a) hinges upon whether its labor and services on the North Fork wells created a dump or mass to which its lien attached.[18]  Cook Inlet acknowledges that a valid dump lien would prime Apollo's interests under AS 34.35.140(c).[19]  While it concedes that All American has provided services and labor that might entitle a claimant to a dump lien, it contends that, in this instance, there is no "dump" to which such a lien may attach.

###### 1.    Summary Judgment Standards.

Fed. R. Civ. P. 56 is made applicable to adversary proceedings pursuant to Fed. R. Bankr. P. 7056.  Under Rule 56, summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[20]  A fact is material only if it is one that "under the governing substantive law . . . could affect the outcome of the case."[21]  A factual issue is genuine if "a jury could reasonably find in the nonmovant's favor from the evidence presented."[22]

---

[18] AS 34.35.140(a) provides:

(a) A person who, at the instance of another who has the right of possession of a mine, or mining claim, oil or gas well, performs upon, in, or about the mine or well any of the kinds of work mentioned in AS 34.35.125, or who performs any other kind of work in the production, piling up, or storing of a dump or mass of mineral, has a lien on the dump or mass, and the gold, gold dust, or other minerals contained in or extracted from it, to secure the amount due the laborer in the production of the minerals.

[19] A dump lien "is prior and preferred over a deed, mortgage, bill of sale, attachment, or other claim whether given before or after the work for which the lien is claimed is started."  AS 34.35.140(c).

[20] Fed. R. Civ. P. 56(a).

[21] *Caneva v. Sun Communities Operating Ltd. P'ship (In re Caneva)*, 550 F.3d 755, 760 (9th Cir. 2008)(citing *Thrifty Oil Co. v. Bank of America Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1046 (9th Cir. 2003)).

[22] *Emeldi v. Univ. of Oregon*, 698 F.3d 715, 730 (9th Cir. 2012)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)(summary judgment requires determination of "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."); *see also Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).

The moving party bears the initial burden of showing that there is no genuine issue of material fact.[23]  This burden is met if the movant identifies "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that demonstrate the absence of a genuine issue of material fact.[24]  If the movant satisfies this burden, the non-moving party must "go beyond the pleadings" to set forth specific facts showing that a genuine issue of material fact remains for trial.[25]  Both parties must support their positions by "citing to particular parts of materials in the record."[26]  The court can only consider admissible evidence; "unauthenticated documents cannot be considered in a motion for summary judgment."[27]  All evidence is viewed in the light most favorable to the non-moving party.[28]

In this instance, the relevant facts are undisputed.  What remains for determination is a legal interpretation of the applicability and scope of the pertinent Alaska statutes regarding dump liens.

### 2.    Alaska's Dump Lien Statute.

As observed by the Alaska Supreme Court, Alaska's "dump lien," appears to be unique in the United States, in that "no other state has a dump lien separate from a mechanic's lien."[29]

---

[23] *In re Caneva*, 550 F.3d at 755; *see also Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002).

[24] *In re Caneva*, 550 F.3d at 755 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

[25] *Id.*

[26] Fed. R. Civ. P. 56(c)(1).

[27] *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).

[28] *Id.* at 772; *see also Singh v. Clinton*, 618 F.3d 1085, 1088 (9th Cir. 2010).

[29] *D.H. Blattner & Sons, Inc. v. N.M. Rothschild & Sons, Ltd.*, 55 P.3d 37, 46 (Alaska 2002).

The state's dump lien dates back to the 1913 Compiled Laws of the Territory of Alaska, § 164 (36 Stat. L. 848).[30]  This early statute provided miners and laborers "a lien upon the dump or mass of mineral-bearing sands, gravels, earth, or rocks, and all gold and gold dust, or other minerals therein,"[31] but did not define the "dump" or "mass," to which the lien attached.[32]  However, in the earliest reported decision construing the statute, *Nordstrom v. Sivertsen-Johnson Mining & Dredging Co.*,[33] the territorial court had little trouble doing so:

> by the very terms of the statute, the dump or mass is particularly referred to and there can be no doubt that the lawmakers intended to confine the lien to the mineral-bearing sands, gravels, earth, or rocks, and other minerals collected and piled up in the dump or mass.  The word "dump" is a term well and definitely known in mining phraseology and operations, meaning the dirt, gravels, rocks, and sands, presumably containing gold, which has been taken from the mine and piled up or collected in a heap on the surface of the ground, to be subsequently sluiced and cleaned up and the mineral or gold dust extracted therefrom.[34]

---

[30] The origins of the Alaska's dump lien actually trace back to a federal statute predating the 1913 territorial version, c. 422, 36 Stat. 848, enacted on June 25, 1910.  *See Donaldson v. Henning*, 4 Alaska 642, 652 (D. Alaska 1913)

[31] 1913 Compiled Laws of the Territory of Alaska § 164 (36 Stat. L. 848).

[32] The parties have not cited any legislative history regarding Alaska's dump lien, and in particular the amendment of the statute to include oil, natural gas, and wells.  Similarly, the court has been unable to locate any relevant legislative history concerning Alaska's dump lien.

[33] 5 Alaska 204 (D. Alaska 1914).  Two earlier decisions discussed, in dicta, the concept of a "dump" under the federal predecessor statute to § 164.  In *Noble v. Gustafson*, 204 F. 69, 71 (9th Cir. 1913), the court stated that the dump consisted of "the pay dirt extracted from the mine."  In *Donaldson v. Henning*, 4 Alaska at 655, the territorial court noted that "the term 'dump' usually refers to the pile or mass of gold-bearing earth or gravel hoisted from a mine, prior to the time it has been washed and the gold and gold dust extracted therefrom."

[34] *Nordstrom*, 5 Alaska at 208.  The court found this to be the "ordinary and natural meaning of the term 'dump'" after looking to definitions of this word in other sources, such as Webster's International Dictionary, the Century Dictionary and Encyclopedia, and Morrison's Mining Rights.  *Id.*

Alaska's territorial court considered whether a dump lien could encumber mineral-bearing sands and gravels that had been loosened from the ground, but not piled into an actual dump or mass.  Unpaid laborers who had worked on a mining dredge claimed priority over an attachment levied against gold and gold dust that had been pulled from a mining claim, but had not been placed into a dump or mass.  The court rejected an expansive definition of the mineral dump subject to the statutory lien, concluding that the term meant:

> the mineral-bearing sands piled up or collected into an aggregate heap or body, and not the mineral-bearing sands or dirt that has been only loosened or broken up, but not piled up on the surface of the ground in some place, so as to constitute a well-defined body of mineral or other matter easily and readily observable, set apart and separated from the native earth, and particularly distinguished from the mere loosened, broken, or dug-up, or thawed-out, earth."[35]

A year after the *Nordstrom* decision, the lien statutes were revised to include a definition of the term "dump."  For purposes of the mining lien, the term was defined to mean:

> the mineral bearing sands, earth, ore, rock and minerals extracted, hoisted and raised from a mine, including coal while in mass at the mine or on the mining claim from which extracted, whether the same be deposited in dumps or piles, or placed in hoppers or tanks,

---

[35] *Id.* at 209.  The court in *Nordstrom* further explained:

> The relation that the dump bears to the mineral dirt that has not been put into a dump may be likened to or illustrated by a manure pile and the scattered manure, or to a stack of hay and the hay that has been cut or mown, but not yet put into a stack.  A statute giving a lien specifically on the pile of manure, or the stack of hay, would hardly extend to the scattered manure, or the mown, but ungathered, hay; nor can section 164, which plainly designates the dump or mass as the subject of the lien, be construed so as to include within its scope the broken-up or thawed-out gravel and sand, that has not been piled up in a dump or mass.  *Id.*

or in sluice boxes or bunkers, or other receptacles, and whether
partially reduced from its primary state or not.[36]

Several years after this amendment, Alaska's territorial court revisited the definition of

a mining dump in *Studdert v. Tanana Valley Gold Dredging Co.*[37]  The court was called upon

to determine whether gold, gold dust, and amalgam taken from the extracted mineral dump,

removed from the mining site, and placed into the hands of a third party bank remained a dump

for lien purposes.  Looking to the statutory definition, the court found that "the Legislature

intended, by the use of this language, to refer only to sands, earth, ore, rock, and minerals which

were either deposited in dumps or piles, placed in hoppers or tanks or in sluice boxes or bunkers,

or other receptacles, located in the same place."[38]  The court, therefore, rejected an expansive

reading of the term, and held that the gold in the bank's possession was no longer subject to the

dump lien.

The mining lien statutes were amended again in 1933.  These amendments expanded the

scope of the liens to include oil and gas wells, and included oil and gas within the definition of

minerals.  Persons who worked on "any mine, or mining claim, oil or gas well,"[39] or provided

work in the production, piling up or storing of a dump or mass of minerals, were entitled to a lien

---

[36] Ch. 13, 1915 Session Laws of Alaska § 13 (image obtained from Alaska Legislative Reference Library, Juneau, Alaska; also accessible at http://home.heinonline.org/titles/Session-Laws-Library/Alaska/).

[37] 8 Alaska 267 (D. Alaska 1931).

[38] *Id*. at 271.

[39] 1933 Compiled Laws of Alaska § 2002.  Such work included "opening up, developing, sinking, drilling, drifting, stopping, mucking, stripping, shoveling, mining, hoisting, firing, cooking, teaming, or . . . any other class or kind of work necessary or convenient to the development, operation, working or mining thereof."  *Id.*

11

against the dump or mass, and the minerals therein, to secure amounts due.[40]  The term "dump"

was also expanded to include "the mineral bearing sands, *gravel*, earth, ore, *stone*, *coal, oil, gas,*

*or other fluids* or minerals extracted, hoisted and raised from a mine or mining claim."[41]  Under

the 1933 amendment, the dump lien attached to a mineral dump whether "deposited on the

ground in a mass, or dumped into bunkers or hoppers, or stored in tanks or reservoirs, or placed

in sluice boxes at the mine, . . . so long as the same is in one mass and can be identified as being

produced by the labor of the lienor."[42]  In 1949, the dump lien statutes were renumbered, but

contained the same provisions.[43]

Alaska's current mining lien statutes remain largely the same as those that governed

during its territorial days.  The statutory definition of a dump or mass for purposes of its mining

liens has been revised to mean:

> the mineral-bearing sands, gravel, earth, ore, stone, coal, oil, gas,
> other fluids or minerals extracted, hoisted, and raised from a mine
> or mining claim, while in mass at the mine or on the mining claim
> or adjacent to it, whether it is deposited in dumps or piles, or
> placed in hoppers, tanks, or reservoirs, or in sluice boxes or
> bunkers or other receptacles and whether partially or wholly
> reduced from its primary state or not.[44]

Consistent with its predecessor statutes, AS 34.35.140(a) provides those performing work

on a mine or well with "a lien on the dump or mass, and the gold, gold dust, or other minerals

---

[40] 1933 Compiled Laws of Alaska § 2005 ("Lien on product").

[41] 1933 Compiled Laws of Alaska § 2001 ("Definitions")(emphasis added).

[42] *Id.* at § 2005.

[43] 1949 ACLA ("Alaska Compiled Laws Annotated") §§ 26-2-1 to 26-2-10.

[44] AS 34.35.170(a)(1).

contained in or extracted from it, to secure the amount due the laborer in the production of the minerals."[45]  Similarly, the dump lien continues to attach to:

> the dump or mass, . . . or other mineral, whether they are deposited on the ground in a mass, or dumped into bunkers or hoppers, or stored in tanks or reservoirs, or placed in sluice boxes at the mine, and attaches to the gold, gold dust, and other minerals so long as they are in one mass and can be identified as being produced by the labor of the lienor.[46]

Significantly, the dump lien is given priority over any other lien or encumbrance regardless of whether it arises before or after that encumbrance.[47]

### 3.    Statutory Interpretation.

Alaska's lien laws are remedial in nature, and should be liberally construed.[48]  However, the statutory provisions that define who qualifies as a lienholder must be strictly construed, because these provisions set out "mandatory conditions precedent" to a person's entitlement to the lien.[49]  The existence and priority of All American's dump lien depends upon the interpretation of two statutes: AS 34.35.140, which creates the dump lien, and AS 34.35.170, which defines the terms "dump" or "mass."

The Alaska Supreme Court has directed courts to interpret state statutes "according to reason, practicality, and common sense, considering the meaning of the statute's language, its

---

[45] AS 34.35.140(a).

[46] AS 34.35.140(b).

[47] AS 34.35.140(c).

[48] AS 34.35.930.

[49] *Lakloey, Inc. v. Ballek*, 211 P.3d 662, 666 (Alaska 2009)(quoting *H.A.M.S. Co. v. Elec. Contractors of Alaska, Inc.*, 563 P.2d 258, 262 (Alaska 1977)).

legislative history, and its purpose."[50]  In furtherance of this directive, Alaska courts "apply a sliding scale approach in matters of statutory interpretation."[51]  As a result, the "plainer the language of the statute is, the more convincing the evidence contrary to that language must be."[52]  Even within this sliding scale, "[b]asic principles of statutory construction 'militate against interpreting a statute in a manner that renders other provisions meaningless.'"[53]  Contradictions should be harmonized.[54]

The Alaska Supreme Court has previously remarked on the dearth of cases construing the dump lien statute, and voiced concern over reliance upon decisions from Alaska's territorial days to interpret that statute in the context of an industry that has undergone considerable technological and business changes.[55]  Echoing the concerns raised by All American, the Court has recognized a need to "adapt the language in those cases to modern times."[56]  Nonetheless, the Court has also cautioned that "we must respect the underlying principles embodied in those cases and the statutes upon which they relied."[57]

---

[50] *Louie v. BP Expl. (Alaska), Inc.,* 327 P.3d 204, 206 (Alaska 2014)(citing *Grimm v. Wagoner*, 77 P.3d 423, 427 (Alaska 2003)).

[51] *Moody-Herrera v. State, Dep't of Nat. Res.*, 967 P.2d 79, 84 (Alaska 1998).

[52] *Chugach Elec. Ass'n, Inc. v. Regulatory Comm'n of Alaska*, 49 P.3d 246, 253 n.20 (Alaska 2002) (citing *Anchorage Sch. Dist. v. Hale*, 857 P.2d 1186, 1189 (Alaska 1993)).

[53] *Rollins v. State, Dep't of Revenue, Alcoholic Beverage Control Bd.*, 991 P.2d 202, 208 (Alaska 1999)(quoting *M.R.S. v. State*, 897 P.2d 63, 66 (Alaska 1995)).

[54] *Id.*

[55] *D.H. Blattner & Sons, Inc.*, 55 P.3d at 46.

[56] *Id.* at 44.

[57] *Id.*

14

### 4.     The Parties' Arguments.

All American asserts a priming dump lien against the entirety of the natural gas remaining in the North Fork wells, senior to Apollo's secured interests.  It argues that Alaska's statutory definition of a "dump" is sufficiently broad to include natural gas accessed through a well even when that gas is left within its native gas reservoir.  All American contends that, once its labor and services provided Cook Inlet access to the gas located within the reservoirs of the North Fork wells, its dump lien attached to such gas under AS 34.35.140(a).

Cook Inlet disagrees.  It argues that All American is attempting to shoe-horn its lien against the wells and the gas therein, provided under AS 34.35.125, into the higher priority dump lien by recharacterizing the gas *in situ* as a "dump" of gas that has been extracted and stored in a reservoir.  Cook Inlet contends that All American has not identified a dump or mass to which its lien may attach.  In support of this argument, it has submitted the declaration of Conrad Perry, its senior vice president and drilling manager.  Mr. Perry states that All American's drilling and digging services did create a dump of earth, but that "[t]here was no oil, gas, or other valuable minerals included in this dump and the Debtors did not receive any money or other payments for the dump."[58]  Mr. Perry states further that Cook Inlet was required to treat and dispose of the dump, and it is no longer located on its property.[59]  He also states that Cook Inlet does not store any of the natural gas extracted from any of the North Fork wells.[60]  Instead, some of the natural gas is used in its facility on-site, and some is transported and used in its Kuastatan Production

---

[58] ECF No. 16, ¶ 8.

[59] *Id.*

[60] *Id.* at ¶ 9.

15

Facility.  The rest is sold into a regulated pipeline.[61]  As a result, Cook Inlet maintains that All American cannot prove that there was a dump or mass to which a lien under AS 34.35.140(a) could attach.

All American does not dispute the substance of Mr. Perry's declaration.  Rather, it directs the court's attention to AS 34.35.140(b), which specifically provides that the dump lien attaches to minerals stored within reservoirs.  All American explains that modern mining techniques now predominantly provide for leaving natural gas in place until needed.  It argues that any interpretation of Alaska's dump lien that does not extend to the storage of natural gas in place effectively negates any application of the dump lien to natural gas.  Such a result, All American argues, is contrary to the legislature's specific inclusion of gas as a mineral that may be part of a dump to which the lien may attach.

### 5.    All American Cannot Establish the Existence of a Dump to Which its Lien May Attach.

While the Alaska Supreme Court has recognized a need to adapt territorial cases interpreting the dump lien statute to modern times,[62] it has also instructed that one statute should not be interpreted in such a way that would render other provisions meaningless.[63]  Underlying principles embodied in the territorial cases regarding dump liens should be respected, and contradictions should be harmonized.  Keeping these instructions in mind, the court begins by noting that the dump lien is but one of three statutory mining liens, each of which encumbers distinct property as part of a detailed legislative scheme.  Pertinent to construction of the dump

---

[61] *Id.* at ¶ 10.

[62] *D.H. Blattner & Sons, Inc.,* 55 P.3d at 44.

[63] *Rollins v. State*, 991 P.2d at 208.

16

lien statute, "[w]hen the phrase 'different classes or kinds of property subject to lien' is used, it refers to mines as defined in this section as one class; mills and machines as another class; and the dump or mass as a third class."[64]  The first lien provided is against the "mine or mining claim, oil, gas, or other claim or well."[65]  This lien extends not only to the mining location, but also encumbers "all valuable mineral deposits, including coal, oil, gas, or other fluid, and all lodes, veins, or rock in place containing minerals."[66]  The second lien available attaches to mills or machines.[67] The third distinct class of property subject to a mining lien under Alaska's statutory scheme is the "dump" or "mass," as well as "the gold, dust, or other minerals contained in or extracted from it."[68]  As 34.35.170(a)(1) defines this class of property as "the mineral-bearing sands, gravel, earth, ore, stone, coal, oil, gas, other fluids or minerals *extracted, hoisted, and raised* from a mine or mining claim, while in mass at the mine or on the mining claim or adjacent to it."[69]  The statutory definition extends the "dump" to minerals "whether [they are] deposited in dumps or piles, or placed in hoppers, tanks, or reservoirs, . . . or other receptacles and whether partially or wholly reduced from [their] primary state or not."[70]

All American asks the court to extend Alaska's dump lien to natural gas accessed through its efforts, but left in place in its native gas reservoir.  Such an interpretation does too much

---

[64]  AS 34.35.170(b).

[65]  AS 34.35.125(a).

[66]  AS 34.35.170(a)(3).

[67]  AS 34.35.130.

[68]  AS 34.35.140(a).

[69]  AS 34.35.170(a) (emphasis added).

[70]  *Id.*

violence to the statutory scheme. Alaska's statutory scheme expressly provides that minerals left in place, including gas, are subject to a mining lien under AS 34.25.125. Under the well recognized maxim of statutory interpretation "expressio unius est exclusio alterius,"[71] the inclusion of minerals left in place as part of that class of property subject to a separate lien against mines weighs strongly against any interpretation that would place such minerals in another property class subject to a higher priority lien, absent clear statutory language to the contrary.[72] All American offers no argument or reason to support its statutory interpretation, which effectively collapses Alaska's more general lien against wells, and the minerals therein, into the higher priority dump lien. Under All American's interpretation, the very same activity that gave rise to the more general lien would simultaneously reward a creditor with a priority lien against the same property. Such an interpretation is contrary to the statutory scheme contemplated within AS 34.35.170(b), which makes clear that the three distinct classes of property are subject to separate liens.[73]

Although the three types of mining liens are not exclusive of one another, a lienor may only claim a lien against more than one class of property "if the facts relative to the labor

---

[71] *See Trapp v. State, Office of Pub. Advocacy*, 112 P.3d 668, 674 (Alaska 2005)("One 'useful and logical' maxim of statutory construction, though it should not be blindly followed, is *expressio unis est exclusio alterius,* which means that to express one thing is to imply the exclusion of others.").

[72] *See Ellingstad v. State, Dep't of Nat. Res.*, 979 P.2d 1000, 1006 (Alaska 1999)(recognizing that the maxim "expressio unius est exclusio alterius" is useful in statutory interpretation, but noting it does not apply if contrary to the purpose of the statute).

[73] AS 34.35.170(b).

warrant,"[74] and its lien must separately state the amount claimed against each class of property.[75] Further, the dump or mass must be identifiable "as being produced by the labor of the lienor."[76] All American cannot satisfy these requirements, because it cannot segregate the work it provided in accessing the gas from any labor or services provided to create a dump of minerals.  Under All American's interpretation of the mining lien statutes, the "dump" already existed, in a natural reservoir, before All American's work even began.

All American's asserted interpretation would also require courts to excise the requirement that minerals, including gas, must be "extracted, hoisted, and raised from a mine or mining claim" to constitute a dump or mass.[77]  Although the statutes provide that a dump or mass may be stored in a reservoir, they nonetheless require that an identifiable dump exist to which the lien created under AS 34.35.140(a) may attach.  Since 1913, the Alaska statutes have required that minerals be physically removed from the mine to constitute a dump or mass subject to a dump lien.  Indeed, the current statutory definition of a dump further requires that it remain "in mass at the mine or on the mining claim or adjacent to it, whether it is deposited in dumps or piles, or *placed* in hoppers, tanks, or reservoirs, or in sluice boxes or bunkers or other receptacles and whether partially or wholly reduced from its primary state or not."[78]  All American asks that the

---

[74] AS 34.35.155(a).

[75] AS 34.35.155(b)(1).

[76] AS 34.35.140(b).

[77] AS 34.35.170(a)(1).

[78] *Id.* (emphasis added).  AS 34.35.140(b) uses slightly different language to provide that the dump lien attaches to the minerals "whether they are deposited on the ground in a mass, or dumped into bunkers or hoppers, or stored in tanks or reservoirs, or placed in sluice boxes at the mine."  The use of the verbs "deposited," "placed," "dumped," and "stored" support a finding that the minerals must be physically removed from the mine or well and resituated in a separate, distinct location before the dump lien can attach.

court simply overlook this statutory requirement for one class of minerals encompassed by the statute. There is no support for this distinction, which runs afoul of the plain meaning of the statutory definition of a mineral dump. To adopt All American's construction would violate another fundamental principle of statutory construction that "militate[s] against interpreting a statute in a manner that renders other provisions meaningless."[79]

The court appreciates that the natural gas industry has undergone substantial and significant changes since 1933, when the dump lien was amended to include oil and gas. However, Alaska has never altered its initial requirement for a dump lien: the existence of a dump created by extracting and hoisting the mineral from the mine itself. The mining lien statutes were amended to include gas and wells within its provisions, rather than carve out any exceptions. The statutory scheme retains distinct liens encumbering separate classes of property. Under this scheme, gas situated in the natural reservoirs of the North Fork wells, although accessed by All American's labor, does not constitute a dump or mass within the definition of AS 34.35.170(a)(1). Rather, this gas falls within the statutory definition of a mineral, and is encumbered by All American's mining lien under AS 34.35.125(a). That lien, however, is subordinate to Apollo's pre-existing deed of trust. For this reason, summary judgment shall be

---

*See Olson v. Olson*, 856 P.2d 482, 484 n.2 (Alaska 1993)(applying the doctrine of *noscitur a sociis*, by which "the meaning of questionable or doubtful words in a statute may be ascertained by reference to the meaning of other words or phrases associated with it.").

[79] *Rollins v. State*, 991 P.2d at 208; *see also Berg v. Popham*, 113 P.3d 604, 609 (Alaska 2005); *Homer Elec. Ass'n v. Towsley*, 841 P.2d 1042, 1045 (Alaska 1992) ("As a general rule, a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.").

granted in favor of Cook Inlet, and against All American, as to its first claim for relief, which asserts a priming dump lien against the natural gas in the North Fork wells.

**B.      All American's Constructive Trust Claim re: Tax Credits**.

Cook Inlet also moves for summary judgment on All American's second cause of action to establish a constructive trust over tax rebate credits payable by the State of Alaska under AS 43.55.025 *et seq*.  All American asserts, in its complaint, that the State of Alaska has made tax credit payments to Cook Inlet based on unpaid invoices for its work and invoices.  All American contends it may seek imposition of an equitable trust on the tax credits received by Cook Inlet on account of those unpaid invoices.

Cook Inlet denies that it has received any payments from the State based upon All American's unpaid invoices.  It has submitted the Declaration of Phillip Elliot to establish that it has not, and will not, receive any payments from the State of Alaska for unpaid work performed by All American.  Mr. Elliott is the senior vice president and chief financial officer for Miller Energy.  He oversees Cook Inlet's finances, including the processes involving the state tax credits.  Mr. Elliott explains that "[t]hrough its cash Tax Credits program, the State of Alaska has historically reimbursed Miller in cash for approximately 35%-65% of its drilling and completion costs and carried-forward annual loss credits in the Cook Inlet area."[80]  He admits that the tax credits are payable only for costs previously paid by the applicant, and that Cook Inlet originally included unpaid All American invoices in its application for drilling and

---

[80]  Decl. of Phillip Elliot in Supp. of Cook Inlet's Mot. for Summ. J., ECF No. 15, ¶ 8.

completion costs tax credits for 2015.[81]  However, Mr. Elliott states that upon discovery of the unpaid invoices within the review process of its application to the State of Alaska, Cook Inlet withdrew those invoices from its application.  He asserts that Cook Inlet is not currently seeking tax credits based upon All American's unpaid invoices, and cannot properly submit unpaid invoices.[82]

In response to Mr. Elliott's declaration, All American asks that the court defer a decision on its constructive trust claim pending further discovery, pursuant to Fed. R. Civ. P. 56(d).[83]  It acknowledges that, absent payment on its unpaid invoices, it has no claim for a constructive trust under Alaska law.  All American sought discovery to verify Mr. Elliot's statements shortly *before* Cook Inlet filed its motion for summary judgment, but had not received a response by the time it filed its opposition.  Although Cook Inlet replied to All American's opposition, it did not address the Rule 56(d) request for continuance pending discovery.  The court construes Cook Inlet's silence on this point as tacit consent to the request, and will enter a separate order requiring All American to supplement its opposition to entry of summary judgment on its claim for constructive trust.

## III.    Conclusion.

All American has failed to show that a dump or mass exists to which its Lien Claim could attach.  Absent the existence of a dump or mass, All American cannot establish a priming dump

---

[81]  *Id*. at ¶ 10.

[82]  *Id*. at ¶ 12.

[83]  Rule 56(d) is made applicable to this case by Fed. R. Bankr. P. 7056.

lien in the natural gas remaining in the North Fork wells superior to Apollo Investment's secured

interests under its previously recorded deed of trust.   Although All American has a valid,

perfected lien against the mine, including the natural gas remaining in place, such lien is junior

and subordinate to Apollo's secured interests.   Therefore, Cook Inlet's motion for summary

judgment shall be granted as to All American's first cause of action, and All American's cross

motion for summary judgment as to the priority of its lien will be denied.   However, the court

shall defer its ruling on the pending cross motions for summary judgment as to All American's

second cause of action for constructive trust, until the parties file supplemental briefs based upon

All American's discovery pending at the time the matter was submitted.

An order shall be entered consistent with this memorandum.

DATED:  March 21, 2017.

BY THE COURT

/s/ Gary Spraker
GARY SPRAKER
United States Bankruptcy Judge

Serve:  ECF Participants per NEF
SVS